## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VICI RACING, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-835-SLR |
| | ) |
| T-MOBILE USA, INC., | ) |
| | ) |
| Defendant. | ) |

Christopher Loizides, Esquire of Loizides PA, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Juan Carlos Antorcha, Esquire and Joseph P. Klock, Jr., Esquire of Rasco Klock Reininger Perez Esquenazi Vigil & Nieto.

Jennifer C. Wasson, Esquire and Peter J. Walsh, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: John D. Lowery, Esquire and Gavin W. Skok, Esquire of Riddell Williams P.S.

**OPINION**

Dated: February 8, 2013
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff VICI Racing, LLC ("VICI" or "plaintiff"), a Florida corporation with its principal place of business in Miami, Florida, filed this suit against defendant T-Mobile USA, Inc. ("T-Mobile" or "defendant"), a Delaware corporation with its principal place of business in Bellevue, Washington, on September 30, 2010. (D.I. 1) Plaintiff claims damages totaling $14,000,000 for the alleged breach of contract relating to a sponsorship agreement for a sports car racing team. (*Id.*)

Defendant asserted three affirmative defenses: (1) plaintiff's complaint failed to state a claim; (2) defendant was fraudulently induced to enter into the contract; and (3) plaintiff failed to perform its own material obligations under the contract. (D.I. 10) Defendant also asserted three counterclaims for: (1) fraudulent inducement; (2) equitable fraud; and (3) breach of contract. (*Id.*) Plaintiff answered the counterclaims on April 21, 2011. (D.I. 21)

The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. The parties tried the case to the court from May 21 - 24, 2012. (D.I. 119 - 122) The following constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## II. FINDINGS OF FACT

### A. Initial Sponsorship Discussions

1. A German executive whose company was sponsoring VICI, an American Le Mans Series ("Le Mans") sports car racing team, approached the CEO of Deutsche

Telekom, Inc.,[1] Klaus-Peter Statz ("Statz"), and told him that VICI was still looking for sponsors. (PTX-4 at 26-27) On March 7, 2009, Statz emailed the VICI Team President, Ron Meixner ("Meixner"), inquiring about "what a possible cooperation with T-Mobile could look like?" (*Id.* at 28) Meixner replied that "Porsche Motorsports USA / VICI Racing" was looking for a sponsor for the 2009-2011 Le Mans seasons. (*Id.* at 27) The sponsorship would be economically valuable to T-Mobile because VICI could "offer T-Mobile to be the network service provider for the VW/Audi Group and Porsche AG Telematics services." (*Id.*) Meixner further offered that VW and Porsche were beginning to use telematics systems "starting with their annual volume of approximately 425,000 (VW / Audi / Porsche, US market)." (*Id.*) Meixner ended his email saying that he was looking forward to "T-Mobile becoming a partner for Telematics applications / Network provider solutions." (*Id.* at 28) Subsequently, Statz forwarded Meixner's email to T-Mobile's CEO, Robert Dotson ("Dotson"), adding that, if T-Mobile sponsored VICI, VICI "would in turn offer the opportunity to enter into the telematics market." (*Id.* at 27) Statz closed his email with the following: "Further information can be provided if T-Mobile US is interested in evaluating this opportunity." (*Id.*)

2. Dotson forwarded Statz's email on March 11, 2009 to the T-Mobile Chief Operations and Customer Officer, Sue Nokes ("Nokes"), with instructions to have someone on the sales team evaluate the proposed VICI sponsorship's business potential. (PTX-4 at 26) Dotson emphasized that he was not interested in the sponsorship without "a big telematics business opportunity attached." (*Id.*) Nokes in

---

[1] Deutsche Telekom, Inc. is the parent company of T-Mobile USA.

2

turn forwarded Dotson's email to Doug Chartier ("Chartier"), T-Mobile's Senior VP of Sales, directing him to advise her about the sponsorship's business potential. (D.I. 120 at 413:4-18; PTX-4 at 26) Chartier forwarded the email chain to Femi Lakeru ("Lakeru"), T-Mobile's VP of the Business Sales Group. He asked Lakeru to start evaluating the sponsorship's business potential and to discuss it with John Horn ("Horn"), T-Mobile's national director for machine-to-machine ("M2M") sales. (D.I. 120 at 413:4-18; PTX-4 at 25-26)

3. Lakeru shared the email chain with Horn the next day, with instructions to "look into this and . . . discuss." (PTX-4 at 25) Ryan Keefe ("Keefe"), a T-Mobile business development manager, emailed Meixner saying that T-Mobile was "interested in a relationship and would like to get a better understanding of what that would look like for both the sponsorship and the telematics services." (DTX-14) In response, Meixner called Keefe and the two of them met later that day. (D.I. 120 at 356:22-357:6) During their meeting, Keefe recalled Meixner saying that "the way this business works, when you sponsor cars, you get their business," for example, XM Radio ("XM") had previously sponsored VICI racing and, based upon this sponsorship, XM was able to get its product in consumer production cars. (Id. at 358:2-5, 359:22-23) Keefe claims that he understood this example to mean that "when we [T-Mobile] sponsor, we [T-Mobile] get the business" as part of the "[s]ame agreement." (Id. at 360:1-8)

4. Meixner then spoke with both Horn and Keefe, on March 13, 2009, about the possibility of a T-Mobile sponsorship. (DTX-20 at 817) He also sent Keefe an outline of what a T-Mobile - VICI racing partnership could possibly include, which Keefe forwarded to Horn. (PTX-9) This sponsorship outline did not mention telematics and

3

did not represent VICI to be a part of Porsche.[2] (*Id.*) Horn then emailed Lakeru an initial overview of the business potential of a VICI sponsorship. (PTX-4 at 25) With respect to the telematics business, Horn related that "we would get the three brands which would be 425[,000] cars a year" and estimated that the total sponsorship value was over $160,000,000 if the sponsorship was a "package deal" with the telematics business from VW, Audi, and Porsche. (*Id.*)

5. Following up on the potential sponsorship a few days later, Meixner emailed Keefe a schedule of events for the "12 hours of Sebring" race that was to be held the upcoming weekend. (DTX-20 at 817) Keefe responded later that day, offering that the sponsorship was "being reviewed by finance . . . ." (*Id.*) Meixner emailed Keefe again on March 18, 2009, asking if Keefe had heard back from T-Mobile's finance department. (*Id.* at 816) Meixner indicated that the VICI team was at the Sebring track and ready to race if the finance department gave the green light. (*Id.*) Keefe replied that the sponsorship was still under review and that T-Mobile was hoping for a final answer by week's end. (*Id.*) Meixner pushed one more time to get an answer by the next day so that VICI could participate in the Sebring race. (*Id.*) Meixner also wrote that his "friends at Porsche/Audi/VW [had] already signaled their full support . . . ."[3] (*Id.*)

6. Shane Johnson ("Johnson"), a T-Mobile financial analyst, emailed Horn a financial analysis of the VICI sponsorship on March 19, 2009. (PTX-4 at 23-24) The

---

[2] The information merely provided that "VICI . . . has had a twenty year winning involvement at all levels of global motor racing, delivering continued success with the Porsche brand." (PTX-9 at 415)

[3] It is unclear if Meixner was referring to the racing sponsorship, the telematics business, or some combination of both.

4

analysis concluded that the sponsorship was only valuable if T-Mobile secured the telematics business. (*Id.* at 24) With the telematics business via the sponsorship, Johnson estimated that T-Mobile would: (1) lose $2 million after the first three years; (2) profit $32 million after 5 years; and (3) profit $91 million after 10 years. (*Id.*) Based on this breakdown, Johnson concluded that the profit from the telematics business justifed the costs of the VICI sponsorship. (*Id.*) However, he made clear that T-Mobile needed to build some kind of risk mitigation into the sponsorship so that T-Mobile could limit its financial liability in the event that the telematics business was not secured. (*Id.*)

**B. Sponsorship Contract Negotiations**

7. After an in-person meeting with Horn and Keefe on March 24, 2009, Meixner emailed Horn a "standard contract" to serve as a base for a VICI - T-Mobile sponsorship agreement. (PTX-62 at 694) This contract did not propose any sponsorship fees or other definite terms, nor did it mention telematics, Audi, VW, or represent VICI as part of Porsche. (*Id.* at 695-704) Keefe emailed Meixner asking how many VW and Porsche cars would be equipped with telematics in each of the 2011, 2012, and 2013 model years. (DTX-26 at 176) Meixner replied the following day with a breakdown of how many VW, Audi, and Porsche telematics-equipped cars would be produced for the 2011 through 2016 model years.[4] (*Id.* at 175) His breakdown mentioned that VW was coming out with a new sedan called the "NMS." (*Id.*) According to Horn, this information (the number of vehicles that will be produced in certain production years)

---

[4] The court notes that other than this email, no other communications relating to a breakdown of how many cars would be equipped with telematics has been brought to its attention.

5

was "critical to [T-Mobile's] analysis" of the sponsorship's feasability. (D.I. 120 at
432:14-20) Furthermore, after reading the email, Horn said that he thought that
Meixner was "deep in the weeds with these [car] guys on all – and he has all this
information. One of the things that surprised me, he even had information on new cars
that I didn't even know existed, this new midsized sedan . . . ." (Id. at 433:4) The next
day, Horn emailed Lakeru the final analysis of the proposed VICI sponsorship. (PTX-4
at 23) Horn began his analysis by saying that "[w]e have spoken directly to . . .
Porsche, Audi, and VW, and we would start getting [telematics] activations next year . .
. ."[5] (Id.) Horn said that VICI had asked for $12 million dollars a year for three years,
but that T-Mobile was ready to offer $5 million a year for three years. (Id.) Horn went
on to say that **"[t]he exit strategy is to tie the sponsorship to the telematics
business . . . . If they fall behind or don't deliver the telematics business [T-
Mobile] would have an out for years two and three of the deal."** (Id. (emphasis
added)) He concluded that the "[b]ottom line is we are spending $15M to get $90M and
potentially much more." (Id.)

8. On March 26, 2009, Horn emailed Meixner the official sponsorship proposal:
"2 cars for three years. Total cost [to T-Mobile] $15M. Paid $1M in 2009, and $7M in
both 2010 and 2011. T-Mobile will receive the telematics and handset business for the
three brands." (PTX-63 at 705) After receiving T-Mobile's proposal, Meixner emailed
Horn a revised version of the base contract. (PTX-63 at 706-712) This contract

---

[5] It is unclear to whom "we" is referring. However, because the second usage is
clearly referring to T-Mobile, it seems that Horn is using "we" in the first instance to
mean T-Mobile personnel.

6

contained the sponsorship fees payable over the 2009, 2010, and 2011 seasons with payments due by January 1, 2010 for the 2010 race season and by January 1, 2011 for the 2011 season. (*Id.* at 707) Although Horn's email proposal stipulated that VICI would race two cars, the revised contract had VICI racing only one car for the 2009 season. (*Id.*) Also, while the email proposal stipulated that T-Mobile would get both telematics and handset business from three unnamed brands, neither of these terms or anything similar appear in the revised contract sent to T-Mobile from Meixner.[6] (*Id.* at 706-12) Meixner emailed a further revised copy of the contract to Horn with a few minor changes but still no mention of either the telematics or handset business, stating that "it would be great if we could wrap this up tonight." (PTX-64 at 717-23, 713)

9. Horn emailed Meixner a revised contract from T-Mobile on March 29, 2009. (PTX-65) This contract was substantially reworked and had comments and questions, inserted by T-Mobile's outside counsel.[7] (*Id.*) It also included the first version of the disputed section 5.8 provision relating to the telematics business.[8] (*Id.* at 731) Section 5.8 provided that:

---

[6]  The recital of Mexner's revised contract does not reference telematics or the three brands, instead stating that "the mutual desire and intent of the parties, by their entering into this Agreement, [is] to promote and maintain their respective corporate images and reputations through participation in the 2009, 2012 and 2011 American LeMans race seasons." (PTX-63 at 707)

[7]  Robert Hines ("Hines"), T-Mobile's in-house counsel, testified that outside counsel made comments on a draft of the sponsorship agreement. (D.I 121 at 657:1-10) Hines further testified that he did not speak with outside counsel about the comments, but took them into consideration in changing the draft. (*Id.* at 711:10-18)

[8]  A comment followed this section, "[I'm not sure what this is or how it ties to the sponsorship]" (PTX-65 at 731)

> VICI agrees to allow [T-Mobile] to supply wireless connectivity for the
> Porsche, Audi, and VW telematics programs beginning in model year
> 2011 and employee handset programs as well . . . .

(*Id.*) The contract did not define telematics, handset program, VW, Audi, or model year,

nor did any other section of the contract illuminate what this provision might entail.

(PTX-65) Porsche was defined.[9] (*Id.* at 729)

10. The next day, Meixner made several small revisions to T-Mobile's proposed

contract and emailed it back to Horn, including deleting the definition of Porsche. (PTX-

66) However, no changes were made to section 5.8.[10] (*Id.*) Before the final

sponsorship agreement was signed, Hines spoke with Meixner about the rights granted

in section 5.8. (D.I. 121 at 663:7-12, 720:5-20) Hines testified at trial that he "asked

[Meixner] if he had the authority to make the grant . . . and [Meixner] said yes." (*Id.* at

720:17-20) However, Meixner represented that, during that conversation, Hines

explained that section 5.8 only meant "that T-Mobile is exclusive to [VICI] and that

[VICI] cannot shop this around and get – promote any other wireless carriers, and that

was it." (D.I. 119 at 83:1-3)

11. Meixner and Lakeru executed a final version of the sponsorship agreement

on March 31, 2009.[11] (PTX-1) The fee schedule - $1 million in 2009 and $7 million in

years 2010 and 2011 - remained in place. (*Id.*) The final version of section 5.8 did not

---

[9] The definition of Porsche was followed by the comment, "[Not clear why we
need this definition since Porsche Corp is not a party to this agt, just the Porsche car
will be under sponsorship.]" (PTX-65 at 729)

[10] The comment questioning the section remained, "[I'm not sure what this is or
how it ties to the sponsorship]." (PTX-66 at 742)

[11] The executed contract is dated March 30, 2009.

mention handsets and read:

> VICI grants to [T-Mobile] the right to be the exclusive wireless carrier supplying wireless connectivity for the Porsche, Audi, and VW telematics programs beginning in model year 2011 with such exclusivity continuing throughout the Term of this Agreement.

(*Id.* at 107) As in prior drafts, telematics, Porsche, Audi, VW, wireless carrier, and model year were all undefined terms. The contract did not purport to bind Porsche, Audi, or VW, nor did the contract represent VICI as being a part of Porsche. However, the contract did contain a section (9.1) that stipulated that each party "has the full power and authority to enter into this Agreement and perform its obligations . . . ." (*Id.* at 109) Horn emailed his superiors, Lakeru and Chartier, informing them that the VICI sponsorship deal was completed. (PTX-7 at 365) Horn concludes the email by saying, "[T-Mobile is] the **EXCLUSIVE telematics provider for Porsche, Audi, and VW**. Total value is in the $90M range. We also are the handset provider as well which will get some business now and 1000's of devices when the US plant opens in two years." (*Id.*)

12. T-Mobile prepared a contract summary of the VICI sponsorship agreement that Hines signed.[12] (PTX-56) The summary listed VICI's obligation to race T-Mobile race cars for three seasons under a section labeled "Business Terms." (*Id.*) It also listed T-Mobile's obligation to pay certain sums of money on certain dates under "Business Pricing." (*Id.*) Lastly, the section labeled "Business Case" resembles section 5.8 of the contract, but instead reads: "VICI to enable [T-Mobile] to be the exclusive wireless carrier supporting the telematics programs for Porsche, VW, and Audi." (*Id.*)

## C. Activities After Entering Into Sponsorship Agreement

---

[12] The date of the summary is unclear.

9

13. On April 7, 2009, Keefe emailed Meixner a PowerPoint presentation about T-Mobile's M2M capabilities and noted that he was looking forward to making a formal presentation to Porsche, Audi, and VW. (PTX-49) The PowerPoint contained 17 slides: 2 slides provided a very general overview of who T-Mobile was (*id.* at 1147-48); 9 slides related to T-Mobile's network capabilities and coverage areas (*id.* at 1149-57); 6 slides, including one labeled "Why Choose [T-Mobile] for M2M?," related to T-Mobile's M2M capabilities (*id.* at 1158-63); and 1 slide had a rendering of the T-Mobile sponsored VICI race car (*id.* at 1164). Later in the month, Keefe emailed Horn informing him that the "President of Porsche US," Paul Ritchie ("Ritchie"),[13] and the "telematics project manager for VW" have been reviewing T-Mobile's M2M capabilities. (PTX 42 at 1032) Keefe noted that he was working on setting up meetings with Porsche and VW, that the car companies were testing T-Mobile's network with good results, but that things were "moving a little slower than I would like . . . ." (*Id.*) The next day, on April 28, 2009, in response to Meixner's reaching out to him, Ritchie emailed the CEO of Porsche Cars North America, Detlev Von Platen ("Platen"), asking if Platen had time for a brief introductory meeting with T-Mobile. (PTX-84 at 7) Ritchie noted that he had already set a meeting for T-Mobile with some of Porsche's "technical guys" in Germany, but that a meeting with Platen would help VICI with its sponsorship. (*Id.*) Platen responded favorably to Ritchie's request, offering a meeting with a Marketing VP, and Ritchie contacted Meixner to set up a time for the meeting. (*Id.* at 6) A day later, Meixner emailed Keefe a list of 15 "key people in telematics" at VW along with

---

[13] Ritchie is not the "President of Porsche US" but, rather, is the President and CEO of Porsche Motorsports North America. (PTX-84)

their email addresses. (PTX-48)

14. On May 8, 2009, Lakeru related a concern to Horn, "there is some question related to the 800 lines of business that VW has here in the US coming over to [T-Mobile]? We signed a deal with Porsche where they agreed to deliver us that business." (PTX-32) Horn replied that "[i]t is all coming. . . . Porsche officially took over all of VW this week so things are a little disjointed. There are two meetings next week so it will keep moving forward." (*Id.*) In preparation for a mid-July meeting between Porsche and T-Mobile in Germany (PTX-87), on June 1, 2009, Porsche requested that Meixner get some "bullet points" from T-Mobile. (PTX-30 at 570) After consulting Horn, Meixner provided Ritchie with the following talking points: "Overview of Telematics program. Services to be offered, project time frames, models to have service embedded. Hardware platform, software platform, concierge services, customer care." (*Id*; PTX-88)

15. The VICI - T-Mobile race car sustained engine and body damage due to an accident at the Lime Rock race on July 18, 2009. (PTX-53; D.I. 119 at 90:3-10, 95:4-9) Later that month, Bill Colleran ("Colleran"), VICI's Commercial Director, emailed Dennis Kelly ("Kelly") in Motorola's M2M division about a possible sponsorship. (DTX-56) Colleran gave Kelly the same data about the number of Audi, Porsche, and VW cars using telematics that Meixner had given to T-Mobile. (*Id.*) Two days later, Kelly asked Colleran, "[w]ho would commit to these numbers? Meaning who would be purchasing these units?" (DTX-54)

16. On August 2, 2009, Meixner sent a letter to T-Mobile's President and legal department notifying them about the accident at the Lime Rock event, stating that the

11

VICI car would not be able to race for the next 45 to 60 days while repairs were being made. (PTX-53) A fellow T-Mobile employee informed Horn on September 25, 2009 that VICI would not be racing at an upcoming event in Atlanta. (DTX-60 at 1262) Horn emailed Meixner saying: "You are missing Atlanta? What about the people we are sending from T-Mobile. Not good." (*Id.*) Meixner replied that VICI had "tried everything [it] could" and that VICI had still "arranged for tickets . . . ." (*Id.*) Horn replied: "Not good." (*Id.*) Meixner replied: "We have no competitive edge right now . . . we are experimenting with all available options we have and the new engine did not work out." (*Id.*) A few days later, Meixner emailed Horn asking about a "big meeting" with VW the next day. (PTX-106 at 195) Horn replied that the meeting was all of the following day in Virginia. (*Id.*) The next day, Meixner asked Horn how the VW meeting went; Horn replied that "[i]t went well" and that "[t]hings are looking good for Audi, [but] [s]low for VW." (*Id.* at 193)

17. Meixner entered into a sponsorship agreement with Cross Country Automotive Services ("CC") on October 15, 2009.[14] (DTX-64) The agreement with CC was $100,000 for the 2010 season and $100,000 for the 2011 season. (*Id.* at 664-65) The sponsorship contract is substantially the same as the T-Mobile contract, but section 5.8 is different in several ways. The CC version of section 5.8 reads:

> VICI **agrees to support** [CC] and its affiliate ATX as the exclusive telematics provider within the automotive industry, including for the Porsche,

---

[14] CC "is in the business of owning and operating an Automotive Services Company including ATX Group, Inc., a Telematics Company service . . . ." (DTX-64 at 664) Because ATX provides telematics software and not the wireless connectivity provided by T-Mobile, VICI's dealings with CC do not appear to conflict with its dealings with T-Mobile.

12

Audi and VW telematics programs, with such exclusivity continuing throughout the Term of this Agreement.

(Id. at 666 (emphasis added))

18. Meixner informed Horn on November 4, 2009 that "[s]ome of my VW guys are coming to Florida next week, let me know when we can chat this week." (PTX-28; DTX-65) Horn replied: "Things are not good. The Audi meeting did not go well and [Lakeru] is still concerned with the program overall. He is not happy about how the program was run or the missed race." (Id.) Meixner replied:

I am helping to get the business, but there has to be also some security and stability for the racing program otherwise our VW/AUDI/Porsche ececs. [sic] especially CEO and Head of the supervisory board are getting very concerned. If you let me know where the issue is I help.

(DTX-66) Thereafter, Meixner sent Horn an email stating: "Resolving the Audi Marketing obstacle." (DTX-71)

19. Meixner entered into a sponsorship agreement with Henkel Corporation ("Henkel") on November 25, 2009.[15] (DTX-121) The agreement with Henkel was $500,000 spread over the 2010 and 2011 seasons, payable by December 31, 2009. (Id. at 118) The Henkel sponsorship contract is substantially the same as the T-Mobile contract, but section 5.8 is different in several ways. The Henkel version of section 5.8 reads:

VICI **agrees to support** HENKEL and its affiliates within the automotive industry, including for the Porsche, Audi and VW brands, **and shall not promote HENKEL's competitors**, with such exclusivity continuing throughout the Term of this Agreement.

---

[15] Henkel is an international company, headquartered in Dusseldorf, Germany, with brands and technologies in three areas: laundry and home care; cosmetics and toiletries; and adhesive technologies. See www.henkel.com.

(*Id.* (emphasis added))

20. Horn emailed Lakeru on November 30, 2009 about a recent meeting with Meixner. (PTX-23; DTX-73) Horn said the meeting was "good yet uncomfortable," and that Meixner was frustrated because Horn let him do all the talking. (*Id.*) Horn said that Meixner had been trying to figure out what he could do "to get things on track" and shared that he had a good meeting with his friends from VW. (*Id.*) Horn did not ask any questions about the VW meeting, but he did tell Meixner that T-Mobile was reviewing the sponsorship agreement. (*Id.*) Horn did not share, however, "what [T-Mobile was] doing to position [itself] to get out of the contract." (*Id.*)

21. Meixner emailed Horn on December 10, 2009 to tell him that he had a meeting with Audi the next day and another with VW the following week. (DTX-76) Meixner also said that he could get Henkel to give T-Mobile their handset business. (*Id.*) Greggory Garrett ("Garrett"), the Chief Strategy Officer for IT & Innovation at VW Group of America, verified Meixner's connections at VW for Horn. (PTX-19 at 522) Garrett said that Meixner had weekly meetings with the head of VW motorsports, Clark Cambell ("Cambell"), and that Cambell's boss would eventually be the one to market the "connected vehicle services" (i.e., telematics). (*Id.*)

## D. Dissolution of the Sponsorship

22. On January 5, 2010, Meixner sent T-Mobile a notice of default for the non-payment of $7,000,000 due under the sponsorship agreement by January 1, 2010. (PTX-41) Two days later, Matthew Welch, a T-Mobile Major Account Executive, emailed Meixner saying:

14

> I received a call from [Volkswagen Group of America] yesterday afternoon
> requesting my presence at an informal one-on-one meeting with Stefan
> Jacoby, Warren Richie and the CFO . . . I must say that this is a wonderful
> opportunity for me and [T-Mobile] and I appreciate your efforts in keeping
> us in the game at VW. . . .
> Once again Ron, I really appreciate you and your efforts.

(PTX-83)  On the same day, Hines sent Meixner a letter terminating the VICI-T-Mobile

sponsorship agreement.  (PTX-40; DTX-80)  The termination letter claimed VICI

materially breached the contract because:

> VICI made a material representation and warranty (in Section 5.8) that
> VICI had the authority to bind Audi, VW and Porsche . . . to an obligation
> making [T-Mobile] the exclusive wireless carrier supplying wireless
> connectivity for the . . . telematics programs beginning in model year
> 2011. As it turns out . . . VICI does not have and has never had the
> authority to grant such rights . . . or to contractually bind Audi and VW in
> that regard. . . . VICI has not provided any other real support to T-Mobile
> to assist us in meeting that objective.
> In addition, we note that VICI failed, without justification or prior notice to [T-
> Mobile], to race . . . at one key event where [T-Mobile] was present with business
> guests.

(*Id.*)

## III. CONCLUSIONS OF LAW

### A. Breach of Contract

#### 1. Section 5.8

23.  The core dispute in this case centers around section 5.8 of the sponsorship

agreement.  Defendant, T-Mobile, contends that:  (1) section 5.8 of the sponsorship

agreement contractually obligated VICI to convey business from VW, Audi, and

Porsche to T-Mobile; and (2) VICI breached the agreement by not delivering this

business.  Conversely, plaintiff, VICI, contends that:  (1) section 5.8 created no such

obligation; (2) VICI fully performed under the contract; and (3) T-Mobile breached the

15

contract by failing to make sponsorship payments.

### a. Section 5.8 is ambiguous on its face

24.  In Delaware, the interpretation of contracts is a matter of law for the court to determine. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). A court's interpretation of a contract "will give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (citations omitted). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.*

25.  If a contract's terms are clear and unambiguous, the court will interpret such terms according to their ordinary and usual meaning. *See Paul*, 974 A.2d at 145. Contract terms are held to be clear and unambiguous "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (citing *Rhone-Poulenc*, 616 A.2d at 1196). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different

16

interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d
at 1195. If a court determines that a contractual provision is ambiguous, the "court may
consider evidence of prior agreements and communications of the parties as well as
trade usage or course of dealing." *Eagle Indus.*, 702 A.2d at 1233.

26. Turning to the VICI - T-Mobile sponsorship agreement, although T-Mobile
has repeatedly asserted that it entered into the sponsorship only to gain the telematics
business from Audi, VW, and Porsche, this intention is not "reflected in the four corners
of the agreement." *GMG Capital Invs.*, 36 A.3d at 779. The recitals state the purpose
of the contract is to "sponsor an American LeMans Series racecar" to "promote and
maintain [the parties'] respective corporate images and reputations through participation
in the 2009, 2010 and 2011 American LeMans race seasons." (PTX-1 at 106) The
sponsorship contract in question is eight pages long and contains over 300 lines of text.
(PTX 1) In these 300 plus lines of text, the word telematics is used only one time, in a
three line provision (section 5.8) with no indication that this provision was the bedrock of
the deal for T-Mobile. (*Id.* at 107) The court will not rely upon the meaning inferred
from such an obscure provision to illuminate the contract's overall scheme or plan. *See*
*E.I. du Pont de Nemours and Co.*, 498 A.2d at 1113.

27. Examining section 5.8 in the context of the larger contract, it is evident that
the language of that provision is "fairly susceptible of different interpretations" and
section 5.8 could "have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at
1195. Section 5.8 recites that "VICI grants to T-MobileUS the right to be the exclusive
wireless carrier supplying wireless connectivity . . . ." (PTX-1 at 107) Although T-Mobile

17

contends that this is in fact language of conveyance, the phrasing is too convoluted to have any one clear meaning. From the final version of section 5.8, it is not clear if VICI has: given T-Mobile the right to go after the telematics business from the three companies; bound itself to help T-Mobile secure telematics business; or given T-Mobile some right to telematics business without the business itself. Furthermore, section 5.8 contains undefined key terms that are open to multiple interpretations. For instance, the contract does not define Porsche, Audi, VW, or from which division of these global companies VICI is purportedly giving T-Mobile business. Lastly, an examination of the rest of the contract reveals no other provisions that in any way illuminate the language contained in section 5.8.

### b. Parol evidence does not resolve section 5.8's ambiguity

28. Because the meaning of section 5.8 cannot be divined from within the contract's four corners, the court must look to "evidence of communications of the parties as well as trade usage or course of dealing" in order to resolve the latent ambiguity. *Eagle Indus.*, 702 A.2d at 1233. An examination of the exhibits and testimony presented at trial does not help define the terms of section 5.8. Emails between the parties reveal that T-Mobile was concerned with only the United States models of the cars produced by VW, Audi, and Porsche and that VICI did convey information relating to how many telematics equipped cars each company would be producing in the coming years. (PTX-4) Hines testified that he called Meixner to clarify section 5.8, asking him if he had the authority to grant the telematics business and Meixner's response was "yeah, yeah, yeah." (D.I. 121 at 659:12-18) Meixner's testimony was that Hines told him that section 5.8 prevented VICI from "promot[ing]

18

other wireless carriers." (D.I. 119 at 82:25-83:3) With respect to the telematics business, Meixner understood that he should promote T-Mobile to his contacts and "open doors." (*Id.* at 83:7-14) However, beyond these sparse details and contradictory testimony pertaining to the contract negotiations, the evidence does not add any detail to the terms of section 5.8. The record contains no evidence demonstrating that either party had a clear understanding of the obligations and duties imposed by section 5.8. The court finds that the terms of section 5.8 are ambiguous on their face, and continue to be ambiguous even in light of parol evidence.

### c. Section 5.8 is unenforceable and severable

29. "A contract must be reasonably definite in its terms to be enforceable." *Scarborough v. State*, 945 A.2d 1103, 1112 (Del. 2008); *see also Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1186 (Del. Ch. 2009) ("binding agreement must address the material terms of the bargain clearly and definitely"); *Most Worshipful Prince Hall Grand Lodge v. Hiram Grand Lodge Masonic Temple, Inc.*, 80 A.2d 294, 295 (Del. Ch. 1951) ("It is well settled that an agreement in order to be a legally binding agreement must be reasonably definite and certain in its terms."). Furthermore, Delaware law holds that "[a]n invalid term of an otherwise valid contract, if severable, will not defeat the contract." *Hildreth v. Castle Dental Ctrs, Inc.*, 939 A.2d 1281, 1283-84 (Del. 2007); *see also Tracey v. Franklin*, 67 A.2d 56, 61 (Del. Ch. 1949) (noting that an illegal provision in a voting trust did not automatically render the entire agreement invalid); *Abercrombie v. Davies*, 123 A.2d 893, 903 (Del. Ch. 1956) (holding that the stockholder provisions were severable and enforceable, after invalidating a portion of a voting agreement);

19

*Weed v. Lyons Petroleum Co.*, 294 F. 725, 731 (D. Del. 1923). "Whether or not the terms of a contract are severable is purely a question of the intent of the parties." *Tracey*, 67 A.2d at 61. When determining the parties' intent regarding severability, Delaware courts ask whether the parties gave a single assent to the whole transaction or whether they assented separately to several things. *Orenstein v. Kahn*, 119 A. 444, 446 (Del. Ch. 1922). "The parties' intent to enter into a divisible contract may be expressed in the contract directly, through a so-called 'severability clause.'" 15 RICHARD A. LORD, WILLISTON ON CONTRACTS § 45:6 (4th ed. 2012); *Doe v. Cedars Academy, LLC*, No. 09C–09–136, 2010 WL 5825343, at *4 (Del. Super. Oct. 27, 2010) (holding that a clear and unambiguous severability clause would allow the remainder of an agreement to be enforced even if a certain provision were invalid); *Evans v. State*, 872 A.2d 539, 552 (Del. 2005) (stating that, in general, severability clauses are enforceable).

30. In this case, it is clear that the terms of section 5.8 offer no degree of certainty or definiteness. (PTX-1 at 107) The contract itself does not define the relevant terms of section 5.8. (*Id.* at 106) As previously discussed, both parties have testified that section 5.8 means something completely different than the other and the brief pre-contract email exchanges between Meixner and T-Mobile employees do not contain any details that sufficiently illuminate section 5.8 as to render it clear and enforceable.

31. The parties expressed their intention that unenforceable contractual provisions be severable from the contract by including section 14.7 in the sponsorship agreement. Section 14.7 recites that:

> The provisions of this Agreement are severable and, if any one or more provisions are determined to be illegal or otherwise unenforceable, in

20

whole or in part, the remaining provisions, and any partially enforceable
provisions to the extent enforceable, shall nevertheless be binding and
enforceable . . .

(PTX-1 at 112) This is a clear manifestation of the parties' intention to create a contract

wherein any unenforceable provisions would not destroy the entire agreement. The

court holds section 5.8 to be unenforceable and severable from the remainder of the

otherwise enforceable sponsorship agreement.

## d. The forthright negotiator principle does not apply

32. T-Mobile argues that, despite the failure of the extrinsic evidence to reveal

the parties' intent with respect to section 5.8 and the telematics business, section 5.8

should nevertheless be construed against VICI under the forthright negotiator principle.

Under Delaware law,

the forthright negotiator principle provides that, in cases where the
extrinsic evidence does not lead to a single, commonly held
understanding of a contract's meaning, a court may consider the
subjective understanding of one party that has been objectively
manifested and is known or should be known by the other party.

United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810, 836 (Del. Ch. 2007). "Only

an objectively reasonable interpretation that is in fact held by one side of the negotiation

and which the other side knew or had reason to know that the first party held can be

enforced as a contractual duty." U.S. West, Inc. v. Time Warner, Inc., No. 14555, 1996

WL 307445, at *10 (Del. Ch. June 6, 1996). Applying the forthright negotiator principle,

the court must determine what T-Mobile's subjective understanding of section 5.8 was,

if T-Mobile objectively manifested this understanding, and if T-Mobile's objective

manifestations alerted Meixner to its subjective understanding of the now contested

section 5.8.

33. T-Mobile's witnesses asserted at trial that T-Mobile's subjective understanding of section 5.8 was a firm and definite conveyance by VICI of telematics business from Porsche, Audi, and VW to T-Mobile. (D.I. 120 at 436:3-438:12, 440:4-21, 443:15-444:19; D.I. 121 at 659:5-661:7) The court does not find these assertions credible, based upon the contemporaneous documents of record, which demonstrate that section 5.8 was added to the sponsorship agreement as "an exit strategy" rather than a bona vide business arrangement. (See, e.g., PTX 4 at 23)

34. Even if the court were to assume the veracity of T-Mobile's subjective understanding, the evidence of record does not support that this subjective understanding was "objectively manifested" to VICI or that VICI knew or should have known of it. In this regard, the absence of any documentation detailing the scope, terms, and conditions of the purported $91 million telematics business arrangement speaks volumes about the purported objective manifestations. Moreover, consistent with the contemporaneous documentation (or lack thereof), the court finds credible the trial testimony of Meixner, who testified that his understanding of section 5.8 was simply that VICI could only promote T-Mobile for any telematics business. (D.I. 119 at 83:1-3) Although Hines testified that he explicitly asked Meixner if he had the authority to grant the rights identified in section 5.8 (and Meixner responded affirmatively), in the context of the documentary record, there is no objective support for the proposition that Meixner had the authority to commit Porsche, Audi, and VW to T-Mobile's version of section 5.8's business arrangement. (D.I. 121 at 720:17-20) For these reasons, the court concludes that the forthright negotiator principle does not apply to the facts of record.

### 2. VICI's failure to race was not a breach

22

Case 1:10-cv-00835-SLR   Document 140   Filed 02/08/13   Page 24 of 31 PageID #: 1622
Case 1:10-cv-00835-SLR   Document 140   Filed 02/08/13   Page 24 of 31 PageID #: 1622

35. T-Mobile also asserts that VICI's failure to race the T-Mobile sponsored car at all of the 2009 Le Mans races is a breach of the sponsorship agreement that gives rise to an independent basis for termination. VICI does not contest that it missed several races during the 2009 season, due to the accident at the Lime Rock race. (D.I. 119 at 90:3-10) VICI argues in this regard that these missed races did not result in a breach under the doctrine of force majeure which was incorporated into the agreement under sections 13.1[16] and 13.2.[17] (PTX-1 at 112)

36. As a general matter, "[f]orce majeure clauses are . . . drafted to protect a contracting party from the consequences of adverse events beyond the party's control." *Stroud v. Forest Gate Development Corp.*, No. 20063-NC, 2004 WL 1087373, at *5 (Del. Ch. May 5, 2004). To this end, "[a]pplication of a force majeure provision, as with any other contractual provision, starts with the words chosen by the drafters." *Id.*

---

[16] Section 13.1 reads:

Although each party hereto will use all reasonable endeavors to discharge its obligations under this Agreement in a prompt and efficient manner, no party hereto accepts responsibility for any failure or delay caused by circumstances beyond its direct control including but not with limitation any strike, lockout or other form of industrial action.

(PTX-1 at 112)

[17] Section 13.2 reads:

If a party's performance of any non-monetary obligation under this Agreement is prevented by any condition wholly beyond such party's control, the affected party will be excused from such performance, provided the affected party: (a) provides prompt written notice of such interference, the nature of such interference and the expected duration of such interference to the other party; and (b) resumes performing its obligations hereunder promptly following the removal of such interfering condition. The other party will be relieved from performing its obligations under this Agreement for the duration of such interference. Such delay or failure shall not constitute a breach of this Agreement under Section 12 (Termination).

(PTX-1 at 112)

23

37. Turning to section 13.2 of the agreement, the force majeure provision at issue may be invoked if three conditions are met: (1) the prevented obligation is a non-monetary obligation that is prevented by a condition beyond a party's control; (2) the affected party provides prompt notice of the interference, its nature, and expected duration; and (3) performance of the prevented obligation resumes as soon as the interference is removed. (PTX-1 at 112; *see supra* note 14)

38. Turning to the facts, the obligation that was prevented in this case was certainly a non-monetary one; VICI was prevented from racing because of damage to the race car sustained in an accident at the Lime Rock race.[18] ((D.I. 119 at 90:3-10; PTX-53) Two weeks after the VICI race car sustained damage, Meixner faxed a notice to T-Mobile's president and legal department explaining that the car would be out of commission for 45 to 60 days. (PTX-53) VICI resumed racing in October 2009 at Mazda Raceway Laguna Seca. (PTX-102)

39. T-Mobile argues that VICI improperly invoked the force majeure provision of the agreement because the interference that prevented VICI from racing was a financial one.[19] (D.I. 126 at 29) The court need not address T-Mobile's legal arguments on this basis because its contention is factually inaccurate. Meixner did tell T-Mobile that, if he had more money, he would be able to get the damaged car fixed faster or, alternatively,

---

[18] There is no evidence or testimony suggesting that the accident was due to something within VICI's control.

[19] In other words, defendant appears to challenge condition one (discussed above). Interestingly, Horn's email during the sponsorship negotiations indicate that T-Mobile was well aware of the risk of having just one race car - "One car would not be good because if it crashes we would no longer have a car in the race." (PTX-4 at 25)

24

if T-Mobile would buy VICI a new car, it would not miss any races. (D.I. 119 at 91:6-24,

237:5-7) However, a lack of financial resources was not the nature of the interference.

The interference was the damage sustained in the accident at the Lime Rock race. The

fact that money can solve a problem does not mean that a lack of money caused the

problem. The court finds that VICI's failure to race the T-Mobile Le Mans car at four

races was not a breach of contract because Meixner adhered to the force majeure

procedures outlined in section 13.2 of the agreement.

## B. Fraud

40. In addition to its breach of contract claim, T-Mobile also claims that VICI is

liable for fraudulent inducement and equitable fraud.[20]  Fraud requires the following

elements:

> 1) a false representation, usually one of fact, made by the defendant;
> 2) the defendant's knowledge or belief that the representation was false, or was
> made with reckless indifference to the truth;
> 3) an intent to induce the plaintiff to act or to refrain from acting;
> 4) the plaintiff's action or inaction taken in justifiable reliance upon the
> representation; and,
> 5) damage to the plaintiff as a result of such reliance.

Zirn v. VLI Corp., 681 A.2d 1050, 1060-61 (Del. 1996).  Equitable fraud requires all the

elements of common law fraud except the knowing or reckless misstatement. Id. at

1061.

41. On the facts of record, and for the reasons previously discussed, the court

does not find, by a preponderance of the evidence, that Meixner made a false

statement, i.e., that Meixner claimed to have the authority to bind VW, Audi and

---

[20]  It is unclear from defendant's brief what type of fraud it contends existed.

Porsche to a multi-million dollar telematics deal. Further, upon consideration of the sophistication of T-Mobile and the facts of this case, the court finds that T-Mobile would not have been justified in any reliance on such representations, even if made. As both of these elements are necessary to a finding of fraud, T-Mobile has not carried its burden to prove fraud.

## C. Damages

42. Having found that VICI did not breach the contract and that section 5.8 is unenforceable and severed from the contract, the court turns its attention to the question of damages. Generally, "the non-breaching party is entitled to recover 'damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made.' Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall.'" *Paul v. Deloitte & Touche*, LLP, 974 A.2d 140, 146-47 (Del. 2009) (citations omitted); *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 347) . Further, damages should be reduced by costs or other loss avoided by the non-breaching party. *See* RESTATEMENT (SECOND) OF CONTRACTS § 350. "[A] party may avoid costs by suspending its own performance when confronted with breach and avoid loss by making substitute arrangements." *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, No. 2742-VCN, 2009 WL 458779, at *4 (Del. Ch. Feb. 23, 2009) (citing RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b ("Once a party has reason to know that performance by the other party will not be forthcoming,

26

he is ordinarily expected to stop his own performance to avoid further expenditure.")).

Also, a party may not generally recover damages for losses that it could have avoided

by reasonable efforts. *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b)

Thus, the injured party has a duty to mitigate or minimize its costs and losses. *Id.*

(citing RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b) (noting that "the injured

party is under no obligation to [mitigate], although it will not be awarded damages for

any loss that could be avoided.").

  43. There is support in the record for the fact that the payment schedule was

back-loaded. Meixner testified that a "normal budget number is about $5 million for a

car" per racing season, but the bottom line would be $2.5 million per car. (D.I. 119 at

268:18-23; D.I. 119 at 41:21-24) The emails between the parties show that VICI

requested $12 million dollars a year for three years, but T-Mobile wanted to offer $5

million a year for three years. (PTX-4 at 23) Horn's analysis stated that "[t]he exit

strategy is to tie the sponsorship to the telematics business . . . . If they fall behind or

don't deliver the telematics business [T-Mobile] would have an out for years two and

three of the deal." (*Id.*) The payment structure offered by T-Mobile and accepted by

VICI, with a low initial payment of $1 million for the 2009 season and two additional

payments of $7 million, for each of seasons 2010 and 2011, as well as Meixner's

search for and securing of sponsors throughout the 2009 race season, bolsters VICI's

claim that $1 million was not enough to race a car for the season. (PTX-1 at 106; DTX-

64; DTX-121)

  44. The sponsorship agreement shows that T-Mobile owed VICI the first $7

million payment by January 1, 2010. (PTX-1 at 106) Instead, after receiving a default

notice sent on January 5, 2010, T-Mobile attempted to terminate the contract on January 7, 2010. (PTX-41; PTX-40/DTX-80) Meixner testified that he was counting on the $7 million to pay some of the expenses incurred in the 2009 racing season, such as the damage to the race car. (D.I. 119 at 269:24-270:5, 272:11-17) As of the end of the 2009 racing season in October 2009, VICI was preparing for the 2010 season. (D.I. 120 at 292:2-11) For the foregoing reasons, the court finds that T-Mobile is in breach of its obligation to pay VICI the first $7 million payment.

45. Knowing that T-Mobile would not make any more payments after sending its termination notice, VICI had a responsibility to mitigate damages. Meixner testified that, although he prepared for the next season, VICI did not race in the 2010 season. (D.I. 120 at 292:2-6, 293:24-294:6) VICI did not present evidence as to its efforts to mitigate T-Mobile's breach by trying to find a primary sponsor for the 2010 and 2011 seasons.[21] Awarding the second $7 million payment, due by January 1, 2011, would provide VICI with an unfair windfall.[22] For these reasons, the court declines to award VICI the second $7 million payment.

## D. Attorney Fees and Costs

46. The sponsorship agreement contains a provision for attorney fees to the

---

[21] There was brief testimony by Meixner that he approached Sprint for sponsorship. (D.I. 119 at 249:9-20)

[22] VICI also argues that it is entitled to the second $7 million payment under section 11.2 (a quasi liquidated damages provision providing that the aggregate payments remain due in the event of a breach) and 12.2 (stating that the payment schedule provision survives any termination). (D.I. 123 at 26-27) The court notes that, in this case, having the second $7 million payment survive the breach would render the liquidated damages "unreasonably large" and "unenforceable on grounds of public policy as a penalty." RESTATEMENT (SECOND) OF CONTRACTS § 356.

prevailing party.[23]  In Delaware, each party is generally required to shoulder its own attorney fees regardless of outcome. *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1044 (Del. 1996). However, when a contact specifically provides an attorney fee provision, i.e., awarding attorney fees to the prevailing party, the courts defer to the parties' agreement. *West Willow-Bay Court*, 2009 WL 458779, at *8 (citation omitted) (noting that "considerations of justice and equity may inform the analysis"). The "contractual provision entitling the prevailing party to fees will usually be applied in an all-or-nothing manner." *Id.* The court has found that T-Mobile breached the sponsorship agreement by failing to make the January 1, 2010 payment. VICI did not breach the sponsorship agreement.  The court concludes, for the purpose of the attorney fee provision, that VICI is the prevailing party in this case.  Pursuant to the sponsorship agreement executed by both VICI and T-Mobile, the court awards VICI its reasonable attorney fees and costs.

## IV. CONCLUSION

For the foregoing reasons, the court finds section 5.8 of the contract to be unenforceable and severed, and that defendant is in breach of its obligation to pay plaintiff the first $7 million payment under the agreement. Additionally, defendant is responsible for plaintiff's reasonable attorney fees and costs. An appropriate order

---

[23] Section 14.6: Attorney's Fees
In any dispute between VICI and [T-Mobile] whether or not resulting in litigation, the prevailing party shall be entitled to recover from the other parties all reasonable costs, including, but not limited to reasonable attorney's fees.

(PTX-1 at 112)

29

shall issue.